UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-------------------------------x
RICHARD THOMPSON and            :
HEATHER THOMPSON,               :
                                :
     Plaintiffs,                :
                                :
v.                              :    Civ. No. 3:08CV01246(AWT)
                                :
PHILIPS ELECTRONICS NORTH       :
AMERICA CORPORATION, a          :
division of PHILIPS HOLDING     :
U.S.A., INC., THE GENLYTE       :
GROUP INCORPORATED, and         :
GENLYTE THOMAS GROUP LLC,       :
                                :
     Defendants.                :
-------------------------------x
```

**MEMORANDUM OF DECISION**

The plaintiffs, Richard Thompson ("Thompson") and Heather Thompson, bring this action against defendants Philips Electronics North America Corporation, a division of Philips Holding U.S.A., Inc., ("Philips Electronics") and Genlyte Thomas Group LLC, which is the successor in interest to The Genlyte Group Incorporated (collectively, "Genlyte"). The Amended Complaint contains two counts. The First Count is a products liability claim brought by Thompson pursuant to the Connecticut Product Liabilities Act ("CPLA"), Conn. Gen. Stat. § 52-572m et seq., and based on two theories of liability: first, that the Lightolier Lytecaster 1102P1 lighting fixture (the "Lighting Fixture") being installed by Thompson was defective because it contains a "razor sharp" sheet metal edge; and second, that the

1

Lighting Fixture was defective because of a failure to warn of the product's unreasonably dangerous edges. The Second Count is a claim for loss of consortium brought by Heather Thompson. After a bench trial, the court concludes that judgment should be entered in favor of the defendants on both counts. The court's findings of fact and conclusions of law are set forth below.

"The CPLA creates a consolidated cause of action for all product liability claims. . . . In other words, the CPLA is 'an exclusive remedy for claims falling within its scope.'" LaMontagne v. E.I. Du Pont de Nemours and Co., 834 F. Supp. 576, 587 (D. Conn. 1993) (quoting Winslow v. Lewis-Shepard, Inc., 212 Conn. 462, 471 (1989)). A claim under the CPLA can only be brought against a "product seller" as defined in § 52-572m:

> "Product seller" means any person or entity, including a manufacturer, wholesaler, distributor or retailer who is engaged in the business of selling such products whether the sale is for resale or for use or consumption. The term "product seller" also includes lessors or bailors of products who are engaged in the business of leasing or bailment of products.

Conn. Gen. Stat. § 52-572m(a). It is undisputed that Genlyte is a "product seller" with respect to the Lighting Fixture. However, Thompson's accident occurred in 2006 and the only evidence with respect to Philips Electronics is that Genlyte Thomas Group LLC, which is the successor in interest to The Genlyte Group Incorporated, was acquired by Philips Electronics around 2008, and the Lightolier brand is now owned by Philips Electronics. There is no evidence that supports a conclusion

that Philips Electronics is a "product seller" under the CPLA for purposes of the Lighting Fixture. Accordingly, judgment should be entered in favor of Philips Electronics with respect to the First Count. Additionally, because a defendant cannot be liable on the Second Count in the absence of a determination that it is liable on the First Count, judgment should also be entered in favor of Philips Electronics with respect to the Second Count.

With respect to the claim in the First Count against Genlyte, pursuant to the CPLA:

> [t]o recover under the doctrine of strict liability in tort, a "plaintiff must prove that: (1) the defendant was engaged in the business of selling the product; (2) the product was in a defective condition unreasonably dangerous to the consumer or user; (3) the defect caused the injury for which compensation was sought; (4) the defect existed at the time of the sale; and (5) the product was expected to and did reach the consumer without substantial change in condition."

Metro. Prop. & Cas. Ins. v. Deere & Co., 302 Conn. 123, 131 (2011) (quoting Potter v. Chicago Pneumatic Tool Co., 241 Conn. 199, 214 (1997)) (citing Giglio v. Connecticut Light & Power Co., 180 Conn. 230 (1980); 2 Restatement (Second), Torts § 402A, pp. 347-48 (1965)).

The plaintiff's first theory of liability is that the Lighting Fixture was in a defective condition unreasonably dangerous to the consumer or user by virtue of the fact that the opening in the sheet metal through which Thompson had to place his hands to install the Lighting Fixture has a "razor sharp" edge. "For a product to be 'unreasonably dangerous,' it 'must be

dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.'" Id. (quoting Potter, 241 Conn. at 214-15).  Here the plaintiff contends that the edge of the approximately six-inch diameter opening is "razor sharp."  However, the evidence shows that the edge is not a sharp edge under a generally accepted safety standard and is not "razor sharp."

Thompson was registered as an apprentice electrician. Victor Becker, a licensed electrician who was responsible for instructing Thompson, testified that there are a couple of different parts of the Lighting Fixture on which you could cut your fingers because they have sharp edges.  Of note, Becker identified those parts as the chips that hold in the trim and the ends that are nailed into the joist, but made no mention of the edge of the opening in the sheet metal through which Thompson had to place his hands to install the Lighting Fixture.  Becker agreed that electricians on the job are well aware that such parts have the potential to have some sharp surfaces.  However, Becker does not wear gloves when installing the Lighting Fixture because he needs to be able to use his fingers to make splices properly and handle both wire nuts and his tools.

Prior to the date of his injury, Thompson had installed hundreds of the Lighting Fixture, and he also usually did not wear gloves when he was handling the Lighting Fixture.  Thompson

conceded that although there are parts of the Lighting Fixture that are sharp, they are not so sharp that he had to wear gloves. He testified that he got deep little cuts in his skin, but he never had any injury that warranted medical attention prior to his accident on August 2, 2006.  In addition, Thompson testified at his deposition that it is common practice for electricians to carry several of the Lighting Fixtures at one time by placing their hand and arm through the opening and supporting them on their forearm, which is inconsistent with the edge of that opening being sharp enough to cause a cut.

The Lighting Fixture is governed by a standard promulgated by Underwriters Laboratory ("UL").  The standard is UL Standard for Safety for Luminaires, UL 1598 ("UL 1598"). The Lighting Fixture meets all the requirements of UL 1598, which has no requirement with respect to sharp edges.  The Lighting Fixture was tested according to UL Standard for Safety for Tests for Sharpness of Edges on Equipment, UL 1439 ("UL 1439"), which is a recognized safety standard test procedure that is used to determine the potential for personal injury resulting from the sharpness of edges.  The edge at issue was tested using a sharp edge tester, as provided for in UL 1439, and the edge meets the requirements of UL 1439.

In addition, the manufacturing process for the Lighting Fixture involves using stamping tooling that is specifically

designed to reduce sharp edges.  The stamped edges are then subjected to a coining operation that further reduces any burrs or sharp edges.  Moreover, there is a quality assurance process which requires that stamped edges be examined using an optical camparator and that any questionable edges be subjected to the sharp edge test in UL 1439, using a sharp edge tester.

   Although the plaintiffs' expert, James L. Rhiner ("Rhiner"), pointed to a photograph in his report that he contends shows a burr on the edge of the sheet metal around the opening in the Lighting Fixture, what is shown is not, in fact, a burr, but only the "parting line" in the material that results from the stamping process.  The photograph relied on by Rhiner was taken under magnification such that the edge was blown up roughly 15 to 20 times its actual size, thereby exaggerating the appearance of the "parting line."  In addition, Rhiner conceded that if sheet metal had undergone a coining process it would not having burring.  Rhiner, who had never heard of UL 1439, performed his own tests on the Lighting Fixture, using three different items; the first two items were different weights of paper and the third was a hot dog.  The court finds his testimony unpersuasive, particularly in comparison to evidence based on testing conducted in accordance with a recognized safety standard.

   Rather than showing that Thompson's injury was the result of the sheet metal around the opening through which he had to place his hands having a sharp edge, the evidence shows that Thompson's

6

injury resulted from him forcefully shoving the Lighting Fixture in an effort to position it correctly, and in the process of doing so, losing his balance and having his hand slip.  The result was his wrist being severely lacerated by the edge of the sheet metal around the opening, and he would have suffered such an injury regardless of whether the sheet metal around the opening had a sharp edge.

　　Specifically, the accident occurred while Thompson was installing the Lighting Fixture in the ceiling over a landing on the basement staircase in a residence.  The entire basement of the residence was being renovated, and Thompson had already installed about 20 Lighting Fixtures in the basement ceiling.  Thompson was installing the last one.  The landing was four steps above the basement floor, and the ceiling joist in which he was installing the Lighting Fixture was approximately seven feet above the landing.  Thompson was standing on a four-foot step ladder he had set up on the landing.  Because Thompson had turned the power off, the only illumination available was a flashlight.  Thompson decided to reuse the branch circuit supply wire and switches that were already in place.  He had to cut the mounting brackets, to make them shorter, in order to make them fit between the joists.  He connected the branch circuit conductors to the conductors in the wiring compartment of the Lighting Fixture.  Because the existing wire was very short, Thompson needed every possible quarter inch of it to properly align the Lighting

Fixture.  The National Electric Code requires that an electrician have a certain length of wire to work with when wiring a fixture, and Thompson concedes that he violated the Code by choosing to work with a short wire.  There was no slack in the wire and not enough space to maneuver.  Thompson was turned at a 45-degree angle while standing on the ladder, and he could not get the fixture to go where he wanted it to go.  At that point, using as much force as he could, because the wire was so short, Thompson pushed on the side of the Lighting Fixture in an attempt to align it with the center line.  It was at this time that Thompson was injured, when his hand slipped and his wrist struck the edge of the opening.  Because Thompson had been using as much force as he could, when he slipped and lost his balance his wrist struck the opening with the force of much of his weight behind him.

When an ambulance arrived at the residence, Thompson informed the attendant that he had been working on a sheet metal frame and pushed his hand into the frame and lacerated his wrist as a result.  The records of Thompson's treating physician, prepared in connection with an office evaluation the following day, i.e. August 3, 2006, reflect that Thompson slipped while on a ladder and had his right hand strike a sharp sheet metal surface.  The records with respect to the surgery Thompson had on August 4, 2006, which were prepared on August 11, 2006, state that he "[r]eported while working as an electrician, [losing] his balance, and striking his wrist/forearm on the electrical fixture

8

box." (Pl's Ex. 9). Thus, the contemporaneous accounts by Thompson of how he suffered his injury are all consistent with the conclusion that as a result of pushing the Lighting Fixture with as much force as he could, he slipped while standing on the ladder and lost his balance, and his hand then slipped off the side of the Lighting Fixture and into the opening, forcibly striking the edge. The plaintiff's expert, Rhiner, conceded on cross-examination that it was probable that, given the amount of force Thompson applied, he would have been cut even if the sheet metal around the opening did not have a sharp edge.

Therefore, the court concludes that Thompson has not established that the Lighting Fixture was in a defective condition unreasonably dangerous to the consumer or user by virtue of the fact that the sheet metal around the opening through which the installer had to place his hands has a sharp edge. In addition, the court concludes that the cause of Thompson's injury was his decision to apply undue force to align the Lighting Fixture, rather than replace a wire that was too short. If that wire had been longer, Thompson would have been able to align the Lighting Fixture using significantly less force. Thus, the court also concludes that Thompson did not establish that any defect caused his injury.

Thompson's second theory of liability with respect to the CPLA claim against Genlyte in the First Count is that the Lighting Fixture was defective because Genlyte failed to warn of

the product's unreasonably dangerous edges. "The established rule in this jurisdiction is that '[a] product may be defective because a manufacturer or seller failed to warn of the product's unreasonably dangerous propensities.'" Sharp v. Wyatt, Inc., 31 Conn. App. 824, 833 (1993) (quoting Tomer v. American Home Products Corp., 170 Conn. 681, 689 (1976)) (alterations in original). "Under such circumstances, the failure to warn, by itself, constitutes a defect." Id. (emphasis in original). Conn. Gen. Stat. § 52-572q, which specifically governs such a theory of liability, provides in pertinent part that:

> (a) A product seller may be subject to liability for harm caused to a claimant who proves by a fair preponderance of the evidence that the product was defective in that adequate warnings or instructions were not provided.
> (b) In determining whether instructions or warnings were required and, if required, whether they were adequate, the trier of fact may consider: (1) the likelihood that the product would cause the harm suffered by the claimant; (2) the ability of the product seller to anticipate at the time of manufacture that the expected product user would be aware of the product risk, and the nature of the potential harm; and (3) the technological feasibility and cost of warnings and instructions.
> (c) In claims based on this section, the claimant shall prove by a fair preponderance of the evidence that if adequate warnings or instructions had been provided, the claimant would not have suffered the harm.

With respect to § 52-572q(b), the CPLA "does not impose a duty to warn of known or open and obvious dangers, and, accordingly, there can be no liability for injuries resulting from open, obvious and known dangers." Gajewski v. Pavelo, 36 Conn. App. 601, 617 (1994). The only danger the plaintiff established here is that striking the edge of a lighting fixture

10

made of sheet metal with substantial force can cause injury. Both Thompson and Becker testified that a person could get cuts on his fingers from certain parts of the Lighting Fixture. Also, Rhiner agreed that it is generally known in the industry that the Lighting Fixture has metal edges with respect to which one should be careful.  Thus, a severe cut being the result of striking the Lighting Fixture with substantial force with one's wrist was an open, obvious and known danger.

In addition, with respect to § 52-572q(c), the plaintiff has not proven by a preponderance of the evidence that he would not have been injured if adequate warnings or instructions had been provided.  The installation instructions were included in the junction box for each of the Lighting Fixtures that Thompson installed in the basement at the residence.  Those instructions specified that the Lighting Fixture is intended to be installed in accordance with, <u>inter alia</u>, the National Electric Code, which requires that an electrician have a certain length of wire with which to work when installing a fixture. In fact, Becker testified that there is usually enough play in the wire. Thompson conceded that using force on a lighting fixture such as the one at issue here can lead to all kinds of possible scenarios, including losing one's balance and falling.  Thompson made a conscious decision to apply undue force to align the Lighting Fixture rather than replace existing wire that was too short, and he did so knowing that he was violating the National

11

Electric Code.  Thus, the court concludes that some warning or additional instruction would not have caused him to have act differently.

Accordingly, judgment should be entered in favor of Genlyte on the First Count with respect to both theories of liability. In addition, judgment should be entered in favor of Genlyte with respect to the Second Count.  Genlyte cannot be liable to Heather Thompson on her claim in the absence of a determination that it is liable on the First Count.

For the reasons set forth above, the Clerk shall enter judgment in favor of the defendants with respect to all claims against them.

It is so ordered.

Signed this 16th day of November, 2012 at Hartford, Connecticut.

                                    /s/AWT
                              Alvin W. Thompson
                         United States District Judge